T.C. Memo. 2000-216

UNITED STATES TAX COURT

CROP ASSOCIATES-1986, FREDERICK H. BEHRENS,
TAX MATTERS PARTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12532-90.                    Filed July 17, 2000.

        P has moved for dismissal or alternative relief
based on respondent's misconduct.  Petitioner's
principal complaints are:
  1.  A civil investigation was carried out in the
guise of a criminal investigation.
  2.  Conversations subject to the attorney-client
privilege were unlawfully monitored.
  3.  Documents were unlawfully seized pursuant to a
defective search warrant.
Petitioner requests that the case be dismissed, or
alternatively, that the Court shift the burden of going
forward with the evidence, and/or suppress evidence
illegally and improperly obtained by R.
        <u>Held</u>:  Petitioner has failed to prove his claims
of misconduct.  The motion will be denied.

Steven Mather and Kenneth Barish, for petitioner.

William H. Quealy, Jr., Henry T. Schafer, Alan Summers, Alcie M. Harbutte, Guy H. Glaser, Zachary King, and Ronald L. Buch, Jr., for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  This case is presently before the Court on petitioner's motion for dismissal or alternative relief based on respondent's misconduct (the motion), filed July 2, 1999.[1] Respondent objects.  For the reasons stated, we shall deny the motion.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

### The Partnership

This case originates with a petition for the readjustment of certain partnership items of Crop Associates-1986, a limited partnership with its principal place of business in Coachella, California, at the time the petition was filed (the partnership).

---

[1] A prior report in this case appears at Crop Associates-1986 v. Commissioner, 113 T.C. 198 (1999).  Since that report, we have substituted Frederick H. Behrens, Tax Matters Partner, for W. Keith Oehlschlager, A Partner Other Than the Tax Matters Partner, as petitioner.

Partnership's Return; FPAA; Petition; Participating Partners

The partnership timely made a return of income for its 1986 taxable (calendar) year (the 1986 partnership return). By notice of final partnership administrative adjustment, dated March 14, 1990 (the FPAA), respondent made adjustments to the 1986 partnership return. The petition was filed on June 13, 1990, by George P. and Ann T. Ballas, two partners other than the tax matters partner (the petitioning partners). The petitioning partners are no longer parties to this case, having entered into settlement agreements with respondent on April 28, 1997, with respect to the partnership items in question. Following the elimination of the petitioning partners from the case, the case was carried on by respondent and certain other partners who had elected to participate in the case. On June 28, 1999, petitioner intervened. Petitioner is a general partner of the partnership, and he has been the tax matters partner (TMP) since at least June 13, 1990. Petitioner is, now, the only participating partner.

FPAA Adjustments and Issues Raised in the Petition

By the FPAA, respondent notified the TMP that he was disallowing Schedule F, Profit or Loss From Farming, deductions of the partnership (the Schedule F deductions) in the amount of $10,104,861. Respondent explained his disallowance of the

Schedule F deductions as follows: (1) The partnership activities constituted a series of sham transactions lacking economic substance; (2) the partnership did not actively engage in the trade or business of farming; and (3) the partnership did not pay or incur any bona fide trade or business expenses during the taxable period, or, if the partnership did pay or incur expenses, the partnership did not establish that these were ordinary and necessary trade or business expenses currently deductible under section 162.

In the FPAA, respondent set forth alternative positions based on his determination that the partners were not entitled to deduct their proportionate shares of the partnership's losses because they were not "at risk", within the meaning of section 465, or did not have sufficient adjusted basis in their partnership interests. See sec. 704(d). Respondent also reduced the partnership's tax preference items by disallowing qualified investment expenses of $9,973,739.

In the petition, the petitioning partners assigned error to all of respondent's adjustments and, with respect to the disallowance of the Schedule F deductions, averred the following: (1) The partnership incurred and paid ordinary and necessary expenses in the conduct of its trade or business of farming, in an amount not less than the amount claimed by the partnership, (2) the partnership engaged in a bona fide farming activity,

which had economic substance and constituted a trade or business for all purposes of the Internal Revenue laws, and (3) the partnership engaged in the trade or business of farming primarily for the purpose of earning profits.

Additional History of the Case

On July 30, 1990, respondent moved to extend the time within which to move or answer the petition from July 30, 1990, to August 27, 1990. We granted that motion on August 2, 1990.

On August 13, 1990, respondent moved to stay the proceedings prior to answer for a period of 1 year (the motion to stay). In support of the motion to stay, respondent claimed that petitioner and certain others were under criminal investigation for their activities in connection with the partnership and other partnerships sponsored by Amcor Capital, Inc., formerly American Agri-Corp. (without distinction, AMCOR). Although petitioner was not, then, a participating partner, see Rule 247(b), and respondent claimed that none of the participating partners were under criminal investigation for their activities in connection with any AMCOR-related partnership, respondent believed that a stay was required to avoid conflicts and difficulties arising from the ongoing criminal investigation of petitioner and certain others. The petitioning partners objected to the motion to stay, arguing, among other things, that not only were none of the participating partners under any related criminal investigation

but neither were any of the 1500 other limited partners affected by any AMCOR-related cases then before the Court. Following a hearing on the motion to stay, we granted the motion to stay and the proceedings were stayed until April 3, 1991 (the stay).

Upon a motion by respondent on April 1, 1991, the stay was extended to October 3, 1991 (the extension). The stay was lifted, however, upon the motion of the petitioning partners, filed April 9, 1991, requesting that we reconsider the extension. The petitioning partners argued on behalf of themselves and the other limited partners of the partnership (together, the limited partners). They argued that, although petitioner was technically a party to this case, see section 6226(c)(1) and Rule 247(a), he was not a participating partner, and the real parties in interest were the limited partners, who held 99 percent of the partnership interests. The petitioning partners argued:

> [T]he limited partners * * * had no involvement in the activities and events which give rise to Respondent's criminal investigation. The * * * [limited partners] are neither the actors in nor the targets of alleged criminality – they are passive investors who seek only the prompt adjudication of civil tax claims asserted and initiated by the Respondent * * *

The stay was lifted on June 19, 1991, and respondent filed the answer on August 19, 1991.

On May 1, 1992, we set this case for trial at the trial session scheduled to commence in Washington, D.C., on October 5, 1992.

On August 11, 1992, respondent and the petitioning partners jointly moved for a continuance, which was granted on August 13, 1992.

On January 12, 1994, we again set this case for trial at the trial session scheduled to commence in Washington, D.C., on October 31, 1994.

On July 22, 1994, the petitioning partners moved for sanctions on account of alleged discovery abuses and violations by respondent (the motion for sanctions). Respondent objected to the motion for sanctions. The petitioning partners replied to that objection, alleging additional incidents of misconduct. The petitioning partners alleged the following incidents of misconduct by respondent:

    (1)   Destruction of documents potentially discoverable by petitioners.

    (2)   Failure to comply with certain discovery orders of the Court.

    (3)   General failure to provide timely, accurate, and complete discovery.

    (4)   Breaches of grand jury secrecy.

    (5)   Bad-faith withholding of pre-grand jury documents.

We considered each of the petitioning partners' claims, and we denied the motion for sanctions in its entirety.

On October 12, 1994, the petitioning partners again moved for dismissal or alternative relief based upon alleged violations

of grand jury secrecy (the grand jury secrecy motion).  By order dated October 19, 1994, we denied the grand jury secrecy motion, finding such motion premature in that issues concerning grand jury secrecy had been raised by the petitioning partners and certain others in an action brought in U.S. District Court for the Central District of California.[2]

On October 19, 1994, we continued the trial of this case until September 11, 1995.

On March 24, 1995, the petitioning partners moved for dismissal or alternative relief based on respondent's misconduct (the 1995 misconduct motion).  Respondent objected.

---

[2]  See Ballas v. United States (In re Grand Jury Proceedings), 62 F.3d 1175 (9th Cir. 1995).  In Ballas, the petitioning partners appealed the U.S. District Court for the Central District of California's order denying their petition for disclosure of certain grand jury investigative materials prepared by the Department of Justice and the Internal Revenue Service during their investigation of the promoters of certain AMCOR-sponsored partnerships (which, we assume, included the partnership).  See id. at 1177 (referring to "the promoters of an abusive tax shelter called AMCOR").  In Ballas, the petitioning partners requested that the Department of Justice investigate certain breaches of grand jury secrecy and that the petitioning partners be given a copy of any resulting report and certain related grand jury materials.  The District Court found that only isolated and technical instances of improper disclosure had occurred and denied the petitioning partners' requests for relief.  The Court of Appeals for the Ninth Circuit affirmed the District Court's action on the basis, in part, that the petitioning partners "were not targets of, witnesses before, or otherwise involved in the grand jury proceeding."  Id. at 1177-1180.

On August 3, 1995, based on the information that a basis of settlement had been reached, we again continued the trial of this case.

Settlement discussions and related procedures continued until the expiration, on February 11, 1999, of the period provided for in section 6224(c)(2) for partners to demand consistent settlement agreements from respondent.  Respondent entered into consistent settlement agreements with some, but not all, of the limited partners.  Petitioner did not enter into a settlement agreement.

On February 2, 1998, respondent and the participating partners who remained active in the case (the remaining participating partners) jointly moved to withdraw certain motions and documents previously filed in this case (the motion to withdraw), including the 1995 misconduct motion.  The motion to withdraw was granted on September 2, 1998.

On October 29, 1998, we allowed counsel for the remaining participating partners to withdraw from the case.

On June 4, 1999, we set this case for trial at a special session scheduled to commence on October 4, 1999 (the October 4 special trial session).

On July 2, 1999, petitioner made the misconduct motion (the motion).  We set the motion for an evidentiary hearing (the hearing) at the October 4, 1999, special trial session.  The

hearing commenced on October 4, 1999, and ended on November 5, 1999.

AMCOR

AMCOR was organized in 1981 by petitioner, George Schreiber, and Robert Wright.

As of December 1988, AMCOR was headquartered in Irvine, California.

For a period beginning some time after AMCOR's organization in 1981 and ending in 1986, AMCOR was in the business of promoting tax shelter partnerships, including the partnership.

General Partners

During 1986 and all subsequent years relevant to this case, petitioner, George Schreiber, and Robert Wright were the only general partners of the partnership. Mr. Schreiber died in August 1991.

Respondent's Examinations

Introduction

During the mid- and late-1980's, AMCOR's business activities drew the attention of various of respondent's officers and employees, particularly civil examination and criminal investigative personnel in respondent's Dallas, Texas, and Laguna Niguel and San Jose, California, districts. Those personnel examined and investigated both AMCOR and various entities and

individuals with a connection to AMCOR.  The following are
pertinent aspects of those examinations and investigations.

Investigation of Paul Hays

In May 1988, George Martin was a special agent working in
respondent's Criminal Investigation Division (CID) and assigned
to respondent's Dallas, Texas, district, with post of duty in
Amarillo, Texas.  In May 1988, Mr. Martin was assigned the case
of Paul Hays, a farmer, who, acting through his attorney, Wendell
Davies, had approached the Internal Revenue Service with
information to disclose concerning a tax shelter scheme in which
Mr. Hays and several other farmers had participated.  Mr. Martin
investigated Mr. Hays' information, and that information led him
to AMCOR and certain employees and agents of AMCOR.  On June 6
and June 14, 1988, with the consent of Mr. Hays and Steve
Sterquell, an accountant employed by Mr. Hays, Mr. Martin
monitored and recorded conversations concerning AMCOR among Ted
Frame, an attorney representing AMCOR, and Messrs. Hays,
Sterquell, and Schreiber.  Mr. Martin came to suspect that AMCOR
was operating an "illegal tax shelter" and that others, including
Mr. Frame, had committed crimes in connection therewith.  On
June 6, 1988, Mr. Martin learned that a civil examination of
AMCOR had been undertaken by personnel assigned to respondent's
Examination Division in Laguna Niguel, California (the Laguna

Niguel Examination Division).  On June 16, 1988, Mr. Martin ceased his investigation of AMCOR.

### Examinations of AMCOR-Sponsored Partnerships

Beginning in 1987 and continuing through July 1988, Bobbie Tadlock, then a revenue agent assigned to the Laguna Niguel Examination Division, conducted a civil tax examination of the income tax returns of certain AMCOR-sponsored partnerships (the AMCOR partnerships examination).  By a letter dated July 14, 1988, Mr. Tadlock informed AMCOR that respondent was considering both penalties against AMCOR under section 6700 for promoting abusive tax shelters and an injunction under section 7408 to enjoin further promotion of such shelters.

Intermittently, from August 1988 to January 1990, the AMCOR partnerships examination was continued by Debbie Gaither, then a revenue agent also assigned to the Laguna Niguel Examination Division.  As part of her examination, Ms. Gaither requested various documents relating to the AMCOR partnerships from AMCOR. Commencing on or about October 17, 1988, and for a period of about 2 weeks, Ms. Gaither visited the offices of AMCOR and made copies of many documents.

On October 26, 1988, at the initiation of Mr. Tadlock, the chief of the Laguna Niguel Examination Division referred AMCOR to respondent's CID for a criminal tax fraud investigation (the fraud referral).  AMCOR is described in the fraud referral as a

promoter of abusive tax shelters.  Its transactions are described as "shams", generating "about $400,000,000 in first year tax deductions from 1981 through 1986, claimed on one hundred plus partnerships [returns]."  The fraud referral accuses AMCOR of entering into purported farming transactions in which, among other things, crops were not grown and AMCOR and farmers drew and exchanged checks with neither party having sufficient funds to cover the checks drawn.  Petitioner, Mr. Schreiber, and Mr. Wright are referred to as "players", along with a group of about 25 farmers, who are described as "culpable".

Examination of AMCOR

From July 1988 until October 1988, Vince Capobianco, a revenue agent assigned to the Laguna Niguel Examination Division, conducted a civil tax examination of the corporate tax returns of AMCOR for its taxable years ending November 30, 1985 and 1986 (the AMCOR corporate examination).  Mr. Capobianco assisted Mr. Tadlock in the preparation of the fraud referral.  Sometime after October 1988, he assisted in the examination of the income tax returns of certain AMCOR-sponsored partnerships.  From March 1989 to November 1989, Mr. Capobianco assisted in a criminal investigation of AMCOR.

Joint Civil-Criminal Investigation

The fraud referral was received by respondent's CID, and, on January 4, 1989, it was assigned to Douglas Watson, then a

special agent working in Laguna Niguel, California.  Mr. Watson
accepted the fraud referral, but not with respect to AMCOR, since
he felt it more appropriate to investigate individuals rather
than a corporation for fraud.  Mr. Watson accepted the fraud
referral as to Mr. Schreiber, an individual, and made him the
target of his investigation.  Subsequently, the Laguna Niguel
Examination Division and Mr. Watson commenced a joint civil and
criminal investigation into AMCOR, its principals, and the AMCOR-
sponsored partnerships' tax shelter activities.  The Internal
Revenue Manual does not prohibit such joint investigations.  On
August 22, 1989, petitioner and Mr. Wright also became subjects
of Mr. Watson's investigation.

### Investigation of Dodson and McCoy

In 1987, Wilbur J. Goolkasian was a special agent in
respondent's CID, assigned to the San Jose, California, district
(the San Jose district), with post of duty in Fresno, California.
In 1987, Mr. Goolkasian received information from the San
Francisco office of the Securities and Exchange Commission
concerning "a large tax shelter fraud scheme" targeted at
investors in the Fresno, California, area.  That information led
him to investigate two individuals, Ronald Dodson and Ray McCoy
(Dodson and McCoy).  During his investigation of Dodson and
McCoy, Mr. Goolkasian learned that Dodson and McCoy were
principals of a Mexican corporation, C.H.M. de Mexico (C.H.M.),

purportedly engaged in farming in Mexico.  C.H.M. had entered into 10 farming contracts (the 10 contracts) with AMCOR.  On February 14, 1988, Mr. Goolkasian was contacted by Mr. Frame, who identified himself as general counsel of AMCOR and asked about his investigation of the 10 contracts.  Because of certain discrepancies in what Mr. Frame told him, Mr. Goolkasian became suspicious of Mr. Frame.  Mr. Frame also represented Dodson and McCoy.  On April 13, 1988, Mr. Goolkasian met with Mr. Frame in pursuit of his investigation of Dodson and McCoy, and, on June 20, 1988, he met Messrs. Frame, Dodson, and McCoy in pursuit of that investigation.  Mr. Goolkasian believed that, at one or both of those meetings, Mr. Frame attempted to mislead him.  As a result, Mr. Goolkasian grew suspicious.  Mr. Goolkasian came to believe that there were one or more tax fraud conspiracies involving, variously, as conspirators, Dodson and McCoy, Mr. Frame, Barry Jones (an accountant for AMCOR), petitioner, Mr. Wright, Mr. Schreiber, and AMCOR.  Mr. Goolkasian's authority to investigate AMCOR was limited because its principal place of business was outside the district to which he was assigned, the San Jose district.  By at least April 1988, Mr. Goolkasian had communicated his suspicions about AMCOR to personnel in the Laguna Niguel Examination Division.  Mr. Goolkasian was instrumental in persuading personnel in the Laguna Niguel Examination Division to make the fraud referral.

On October 19, 1988, Mr. Goolkasian traveled to Texas in furtherance of his investigations of the various tax fraud conspiracies that he believed he had found during his investigation of Dodson and McCoy. He interviewed Messrs. Hays and Davies, who agreed to become confidential informants for Mr. Goolkasian. On November 14, December 8, and December 9, 1988, with the consent of Messrs. Davies and Sterquell, Mr. Goolkasian monitored and recorded certain conversations in Mr. Davies' office. On November 14, 1988, the participants in the conversation were Messrs. Frame and Davies, and, for a portion of the conversation, Mr. Sterquell. On December 8 and 9, 1988, the participants were the same with the addition of Mr. Schreiber (Mr. Sterquell also arrived late for the December 8 conversation).

On October 26, 1988, Mr. Goolkasian submitted a request to the chief of the CID, San Jose, California, to make Mr. Frame officially the subject of a criminal investigation. Mr. Goolkasian's request was approved on November 4, 1988.

On March 21, 1989, Mr. Goolkasian executed a search warrant (the warrant) at 2301 Dupont Drive, Suite 510, Irvine, California. Application for the warrant (the application) was made by Mr. Goolkasian to the Hon. George H. King, U.S. Magistrate, Los Angeles, California, on March 14, 1989. Attachment A to the application describes AMCOR's offices as the

premises to be searched (the premises). Attachment B to the application states Mr. Goolkasian's belief that, on the premises, there are concealed various business records of AMCOR, "for the years 1982 through 1988, inclusive, and relating to the following partnerships and corporations: [a list of 192 entities, not including the partnership]". The application states that the items to be seized are "the fruits, instrumentalities, and evidence of conspiracy to commit tax evasion, in violation of 18 U.S.C. § 371 and 26 U.S.C. § 7201, and aiding or assisting in the preparation of false or fraudulent tax returns, in violation of 26 U.S.C. § 7206(2)." Mr. Goolkasian's affidavit is attached to, and made part of, the application. Attached to it are lists of entities that had farming agreements with AMCOR. The partnership's name appears on one of those lists. Items were seized pursuant to the warrant, and an employee of respondent's prepared a detailed inventory of those items.

On March 27, 1989, Mr. Davies recorded a telephone call among himself, Mr. Frame, and Bruce Hochman, a criminal defense attorney retained by Mr. Frame. He did so without authorization or permission from Mr. Goolkasian. Mr. Goolkasian reviewed the record of that conversation. On March 28, 1989, Mr. Davies was instructed not to record any more conversations with Mr. Hochman. Mr. Goolkasian informed Mr. Hochman that the conversation of March 27, 1989, had been recorded.

The investigation of Dodson and McCoy was closed sometime prior to March 1992, after Dodson and McCoy had pled guilty to filing false income tax returns.

Grand Jury Investigation

In March 1990, the District Director, Laguna Niguel, California, requested William Shipley, Regional Counsel, Western Region, to recommend to the Department of Justice (the Department) that the Department institute a grand jury investigation into the activities of petitioner, Messrs. Schreiber and Wright, and two others (but not AMCOR) in connection with the operation of a fraudulent tax shelter. Mr. Shipley made that recommendation, and the Department accepted it; a grand jury investigation was commenced in June 1990 (the grand jury investigation).

The joint investigation ended when the grand jury referral was accepted. During the course of the grand jury investigation, the Laguna Niguel Examination Division continued the AMCOR partnerships examination.

On March 1, 1993, the Department notified Mr. Shipley that the Department was declining prosecution of the subjects of the grand jury investigation. The letter so notifying Mr. Shipley stated: "Although evidence uncovered to date indicates that the principals of * * * [AMCOR] were involved in the operation of a fraudulent tax shelter, this office has concluded that two

problems are present in this case which will prevent a successful prosecution of the * * * matter." The first problem was the death of Mr. Schreiber, whose presence the Department thought vital to a successful prosecution of the other subjects of the grand jury investigation. The second problem was the risk of adverse court rulings on evidentiary questions arising in connection with evidence resulting from the monitoring of Mr. Frame.

## OPINION

### I. The Motion and the Hearing

The motion is made pursuant to Rules 53, 123, 142(a) and requests that this case:

> be dismissed, or alternatively, that the Court shift the burden of going forward with the evidence, and/or suppress evidence illegally and improperly obtained by Respondent through pervasive and egregious misconduct, which has severely and irreparably prejudiced the Tax Matters Partner's ability to present his case.

Commencing on October 4, 1999, and ending on November 5, 1999, we held a hearing at which petitioner presented evidence in support of the relief requested in the motion (the hearing).

At the close of the hearing, petitioner agreed that his principal complaints were as follows:

1. A civil investigation was carried out in the guise of a criminal investigation.

2. Conversations subject to the attorney-client privilege were unlawfully monitored.

3.   Documents were unlawfully seized pursuant to a defective search warrant.

Petitioner further agreed that the harms of which he complains are (1) prejudice to petitioner in presenting his case and (2) the additional interest on any deficiency that would result to petitioner on account of respondent's causing a delay in resolving the case.

## II.   Petitioner's Memoranda

Petitioner filed a post-hearing memorandum in support of the motion (petitioner's memorandum) and incorporated into the motion the memorandum filed March 24, 1995, by the petitioning partners in support of the 1995 misconduct motion (petitioning partners' memorandum).  In the introduction to petitioner's memorandum, petitioner states:  "The pervasive nature of Respondent's misconduct has caused infringements of the TMP's, AMCOR's and the AMCOR's partnerships' [including Crop Associates-1986] constitutional rights".  Both petitioner's memorandum and the petitioning partners' memorandum complain of "a complex weave of especially prejudicial illegal and improper acts".  In each memorandum, the complaint is followed by a list of actions taken by respondent and complained of by the author of the memorandum. The lists are different, and we assume that petitioner no longer

relies on the list of actions in the petitioning partners'

memorandum.[3]  The list in petitioner's memorandum is as follows:

    1.    Use of fraud, deceit and trickery in order to procure evidence for a criminal investigation.

    2.    Misuse of a civil tax examination as a guise to secure evidence for use in a criminal tax investigation.

---

[3]  The list in the petitioning partners' memorandum is as follows:

1.  Misuse of a civil tax examination as a guise to secure evidence for use in a criminal tax investigation.

2.  Invasion of privileged attorney-client communications through unlawful monitoring of meetings and telephone conversations.

3.  Deprivation of access to vital business books and records by their seizure and extended retention pursuant to a search warrant that was improperly sought and wrongfully issued on the basis of material misrepresentations of fact made under oath.

4.  Gross negligence in the care and maintenance of the seized records while in the Government's custody so that key documents were lost and important computerized information rendered useless.

5.  Misrepresentation of the status and duration of a related grand jury investigation in a manner that seriously impeded the civil tax litigation.

6.  Intimidation of targets of the criminal tax investigation with the result that their assistance and testimony was unavailable to Petitioners.

7.  Coercion and improper inducement by Government agents of witnesses to procure favorable -- and bury unfavorable -- testimony.

3.  Invasion of privileged attorney-client communications through unlawful monitoring of meetings and telephone conversations.

4.  Deprivation of access to vital business books and records by their seizure and extended retention pursuant to a search warrant that was improperly sought and wrongfully issued on the basis of material misrepresentations of fact made under oath.

5.  Misrepresentation of the status and duration of a related grand Jury investigation in a manner that seriously impeded the civil tax litigation.

6.  Improper dissemination of grand jury materials.

7.  Recalcitrance during discovery, resulting in abnormal prejudicial delay.

8.  Obstreperousness and stonewalling during the hearing on this matter, causing additional unwarranted delay.

After discussing certain preliminary matters, we shall address the items in petitioner's list, keeping in mind petitioner's principal complaints and the claimed harms (as stated at the end of the hearing) as an aid to understanding petitioner's list.

III.  Jurisdiction

A.  Introduction

Respondent filed a brief in answer to petitioner's memorandum (respondent's brief).  In that brief, respondent asks:

> As a matter of law, does the TMP have standing to raise (or rely upon) alleged violations of the constitutional rights of third parties (specifically AMCOR, its principals, and AMCOR-sponsored partnerships (other than Crop Associates-1986)) as the basis for his request for sanctions against Respondent?

Respondent answers that petitioner has standing only to ask redress of violations of rights that he holds in his capacity as TMP and a partner of the partnership. Essentially, we agree with respondent. On the question of standing, see Dixon v. Commissioner, 90 T.C. 237, 243-244 (1988). Respondent's question, however, suggests a more fundamental issue, viz, the limits of our subject matter jurisdiction in this case.

B. Limited Jurisdiction To Redetermine Partnership Items

This is a case brought pursuant to section 6226 for the redetermination of certain partnership items. Section 6226 is a part of subchapter C, chapter 63, subtitle F of the Code (subchapter C). Subchapter C comprises sections 6221 through 6233. Subchapter C was added to the Code by the Tax Equity & Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 402(a), 96 Stat. 324, 648. Congress added subchapter C to the Code for the purpose of changing prior law, under which the Federal income tax consequences of partnership operations were determined at the partner level, generally in a separate proceeding with respect to each partner. See H. Conf. Rept. 97-760, at 599 (1982), 1982-2 C.B. 600, 662 (conference report accompanying H.R. 4961, 97th Cong., 2d Sess. (1982), which, when enacted, became TEFRA). In general, subchapter C provides that the tax treatment of partnership items will be determined at the partnership level in a unified partnership proceeding rather than

in separate proceedings with each partner. See, e.g., sec. 6221; H. Conf. Rept. 97-760 (1982), supra at 599, 1982-2 C.B. 662.[4]

Our role in a subchapter C proceeding is limited by section 6226(f) to the determination and allocation of partnership items. Section 6226(f) provides:

> A court with which a petition is filed in accordance with this section shall have jurisdiction to determine all partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment relates and the proper allocation of such items among the partners.

We have no authority under section 6226(f) to determine any affected item or the tax liability of any partner.[5] See, e.g., Crop Associates-1986 v. Commissioner, 113 T.C. 198 (1999). In Dynamic Energy, Inc. v. Commissioner, 98 T.C. 48 (1992), an entity level proceeding involving an S corporation, we held that we lacked jurisdiction in such a proceeding to consider a defense arising at the shareholder level and personal to the wife of a shareholder. We have held similarly in subchapter C proceedings.

---

[4] A "partnership item" is any item required to be taken into account for the partnership's taxable year to the extent that the regulations provide that such item is more appropriately determined at the partnership level rather than at the partner level. Sec. 6231(a)(3). A "nonpartnership item" is any item which is not, or is not treated as, a partnership item. See sec. 6231(a)(4). An "affected item" means any item to the extent that such item is affected by a partnership item. See sec. 6231(a)(5).

[5] See sec. 6230(a)(2), describing situations in which the deficiency procedures provided for in subchapter B, chapter 63, subtitle F of the Code will apply to deficiencies attributable to affected items.

See, e.g., <u>Life Care Communities of America, Ltd. v.</u> <u>Commissioner</u>, T.C. Memo. 1997-95 ("It is now well settled that the Tax Court lacks jurisdiction to consider whether a taxpayer/partner is entitled to innocent spouse relief under section 6013(e) in the context of partnership level proceedings."). Our jurisdiction under section 6226(f) is to determine certain partnership items (and related allocation questions), and, in exercising that jurisdiction, we must be careful not to consider extraneous claims unrelated to that limited jurisdiction.

### C. Conclusion

Consistent with our limited jurisdiction under section 6226(f), we can consider petitioner's claims of misconduct that relate to respondent's determination (or allocation) of partnership items of the partnership. We shall examine how respondent conducted himself with respect to the partnership, and not how he conducted himself with respect to any other person, except to the extent such person was acting for the partnership. We shall address standing with more particularity as we proceed.

### IV. Court's Power and Authority

Having determined that the claims that we can consider are limited by our subject matter jurisdiction, we must determine whether we have the power and authority to provide the relief requested by petitioner.

Petitioner asks the Court to use its inherent power and authority to regulate and supervise proceedings before it so as to insure the integrity of its processes.  See Freytag v. Commissioner, 501 U.S. 868, 891 (1991); Chambers v. NASC0, Inc., 501 U.S. 32, 43-46 (1991).  The Court's inherent power extends to regulate both conduct before it and conduct beyond its confines.  See Chambers v. NASCO, Inc., supra at 44.  The Court has recognized its authority to maintain the integrity of its proceedings and its ability to provide relief for a party's misconduct.  See, e.g., Dixon v. Commissioner, T.C. Memo. 2000-116 (imposing additional sanctions, some on the basis of inherent power); Dixon v. Commissioner, T.C. Memo. 1999-101; CMEM, Inc. v. Commissioner, T.C. Memo. 1991-467.

V.  Burden of Proof

Petitioner has the burden of establishing the allegations of illegal and improper acts by respondent that are the basis of the motion.  See Rakas v. Illinois, 439 U.S. 128, 130 n.1 (1978) (citing Simmons v. United States, 390 U.S. 377, 389-390 (1968) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure.")).

VI. "<u>Invasion of privileged attorney-client communications through unlawful monitoring of meetings and telephone conversations.</u>"

We dispose of this complaint first because, for the most part, it deals with a matter already disposed of by the Court.

In the motion, petitioner states: "Respondent engaged in illegal monitoring of attorney-client communications, which conversations were protected by the joint defense privilege." In petitioner's memorandum, petitioner states:

> On several occasions in this case, the Respondent utilized Wendell Davies -- an attorney representing certain farmers who had contracted with AMCOR partnerships -- as a confidential informant (ultimately paid) to engage in monitored telephone conversations or meetings with Ted Frame, an attorney representing AMCOR, its principals and employees, and AMCOR partnerships.

Although petitioner is not specific about the "several occasions" he has in mind, the focus of petitioner's complaint with respect to conversations participated in by Mr. Frame appears to be the conversations monitored and recorded by Mr. Goolkasian on November 14, December 8, and December 9, 1988 (the three conversations). With respect to the three conversations, petitioner has failed to establish any attorney-client privilege including joint defense privileges, or the application of the so-called "work product" doctrine. See <u>Hickman v. Taylor</u>, 329 U.S. 495 (1947).

Indeed, petitioner has failed to prove that Mr. Frame was the recipient of any privileged communications with respect to

the partnership. Mr. Frame testified that he had no written agreement with the partnership to perform legal services but only an oral agreement to "perform whatever legal services might be required" (which oral agreement he had with all of the AMCOR-sponsored partnerships). He misidentified "AMCOR or an AMCOR affiliate" as the general partner of the partnership with whom he made that oral agreement. He could not recall any services that he had performed for the partnership or whether he billed it for any services. Besides failing to prove the privileged or otherwise protected nature of the three conversations, petitioner has failed to prove the communication of any privileged information from the partnership to Mr. Frame or that, with respect to the partnership, Mr. Frame ever produced any material subject to the work product doctrine.

Petitioner also complains with respect to one or more conversations on or about March 27, 1989, involving Mr. Hochman (a criminal defense attorney retained by Mr. Frame), Mr. Frame and Mr. Davies that were monitored or recorded by Mr. Davies. Those conversations were monitored and recorded without the permission or authorization of Mr. Goolkasian. Petitioner has failed to prove that the partnership enjoyed any privilege or other protected status with respect to those conversations. In any event, Mr. Goolkasian informed Mr. Hochman of Mr. Davies'

actions, and petitioner has failed to demonstrate any harm to the partnership on account of such recording.

Petitioner's complaint with respect to respondent's monitoring or recording of conversations fails to establish any ground on which to base any sanction of respondent in this case.

VII.  "Use of fraud, deceit and trickery in order to procure evidence for a criminal investigation."

A.  Introduction

In the motion, petitioner claims:

> The Respondent's civil examination of the AMCOR partnerships began in May 1988.  Although a concurrent criminal investigation of the partnerships was ongoing, the Respondent's agents failed to notify AMCOR or its general partners.  Moreover, during the time the two investigations were proceeding concurrently, civil agents, acting as undercover criminal investigators, collected thousands of pages of documents from the AMCOR partnerships.  These are the very documents Respondent wishes to introduce as evidence during the trial of this matter.

Petitioner demands:

> Documents voluntarily disclosed to Respondent's civil examination agents during the time such agents were acting as undercover criminal agents, should be suppressed.  United States v. Tweel, 550 F.2d 297, 299 (5th Cir. 1977).  Information voluntarily produced by a taxpayer cooperating with what he believes to be a civil investigation must be suppressed if he was misled and the investigation really was criminal.  Id.

In petitioner's memorandum, he states:

> This case involves a clandestine criminal investigation supported by civil agents, with the specific purpose of obtaining evidence of criminal and civil fraud.  The result, however, was that Respondent illegally acquired substantial volumes of documents, interviews and other

evidentiary materials he would not have otherwise obtained.

The gravamen of petitioner's complaint appears to be that, had petitioner (or any other partner) been aware that a criminal investigation was underway, no one representing the partnership would have cooperated in a civil examination of the partnership. Petitioner equates respondent's silence with fraud, deceit, and trickery. Petitioner reasons that respondent obtained evidence by such means from the partnership, and such evidence must be suppressed in this proceeding.

B.  Grounds for Suppression of Evidence

Respondent may not develop a criminal investigation under the auspices of a civil examination. See, e.g., United States v. Grunewald, 987 F.2d 531, 534 (8th Cir. 1993). Nevertheless, he may pursue civil and criminal investigations either simultaneously or successively. See United States v. Kordel, 397 U.S. 1, 11 (1970); Standard Sanitary Manufacturing Co. v. United States, 226 U.S. 20, 52 (1912). Respondent must be careful, however, not to represent to a taxpayer that an investigation of the taxpayer is routine when, in fact, it is a criminal investigation. In a criminal case, which this is not, misrepresentations of that sort may give a court cause to suppress evidence resulting from the investigation because it was obtained in violation of the taxpayer's rights under the Fourth or Fifth Amendments to the Constitution. See, e.g., United

States v. McKee, 192 F.3d 535, 542 (6th Cir. 1999); United States v. Peters, 153 F.3d 445, 451 (7th Cir. 1998) ("A consensual search is unreasonable under the Fourth Amendment or violative of due process under the Fifth Amendment if the consent was induced by fraud, deceit, trickery or misrepresentation by the revenue agent." (Fn. ref. omitted.)); United States v. Grunewald, supra at 534; United States v. Tweel, 550 F.2d 297, 299 (5th Cir. 1977).

We have not stated a rule precluding the suppression of evidence in a civil case on account of violations of a person's Fourth Amendment rights. See Jones v. Commissioner, 97 T.C. 7, 27 n.8 (1991). In Jones, the taxpayers claimed that the Commissioner's agents violated their constitutional rights by gathering evidence during a criminal investigation that was conducted under the guise of a civil examination. See id. at 26. The taxpayers argued that, but for the conduct of such agents, they would not have provided certain evidence that was subsequently used in a criminal prosecution of them and in determining deficiencies in tax. See id. We agreed with the taxpayers that they had shown inappropriate or reprehensible activities by the Commissioner's agents. See id. at 29. We found, however, that the alleged violations occurred before any deficiency had been determined and that any statements and documents given to the Commissioner were given with the knowledge

and consent that they might be used against the taxpayers in a civil tax controversy.  See id. at 27.  We considered the cost to the Court's truth-finding function of suppressing the documents and evidence in question and concluded: "This cost is not warranted here due to factors of remoteness and unsuitability of the sanction as it relates to the violation of the rights and the use of the fruits of such violation."  Id.

C.  Discussion

For a taxpayer to prevail in his claim that the Commissioner violated his Fourth Amendment rights by obtaining evidence by fraud, trickery, or deceit, the taxpayer must show an affirmative act of misrepresentation by the Commissioner.  See United States v. McKee, supra; United States v. Peters, supra; Jones v. Commissioner, supra at 28.[6]  He must also show some resulting prejudice to his rights, see United States v. Grunewald, supra at 534, and that evidence actually was obtained as a result of the alleged deception; see United States v. McKee, supra at 542.  Petitioner bears the burden of proof, see supra sec. V., and, as we said in Jones v. Commissioner, supra at 28:  "To prevail, petitioners must show by clear and convincing evidence the fraud

---

[6] Petitioner asks us to suppress documents voluntarily disclosed to respondent.  He does not appear to be making a Fifth Amendment claim with respect to those documents.  In any event, petitioner has no Fifth Amendment privilege to protect against the compelled production of incriminating documents that have been disclosed voluntarily to respondent and are in respondent's possession.  See Fisher v. United States, 425 U.S. 391 (1976).

or deceit on the part of the IRS." (Emphasis added.) Petitioner has failed to make the requisite showings.

It is true that, by the FPAA, respondent made adjustments to the 1986 partnership return. Undoubtedly, some examination of the 1986 partnership return preceded the FPAA. Nevertheless, petitioner has failed to prove that, in connection with that examination, respondent misrepresented anything to him or to anyone else. Revenue Agent Tadlock commenced an examination of certain AMCOR-sponsored partnerships in 1987 (the AMCOR partnerships examination). He continued that examination through July 1988, when his participation ended, and the examination was continued by Revenue Agent Gaither, sporadically, until January 1990. Petitioner has failed to prove that the 1986 partnership return was the subject of either agent's examination. He has failed to prove that Ms. Gaither obtained any documents relating to the 1986 partnership return on her visit to AMCOR commencing on October 17, 1988. He has failed to prove that the 1986 partnership return was the subject of the AMCOR corporate examination carried on by Revenue Agent Capobianco. Indeed, petitioner has failed to prove even the date on which the examination of the 1986 partnership return commenced or who conducted that examination.

Even assuming some misrepresentation, petitioner has failed to show any prejudice to the partnership or that any evidence

actually was obtained pursuant to that misrepresentation. Petitioner claims that, as a result of respondent's concealment of his criminal investigation, respondent was able to obtain "putative extensions" of the statute of limitations. We have found that the 1986 partnership return (a calendar-year return) was timely made and that the FPAA was dated (and, we assume, mailed) on March 14, 1990. On the face of it, respondent had no need of any extension of the period of limitations, see section 6229(a), (d), and, in any event, petitioner has failed to prove that any agreement to extend the section 6229(a) period was entered into by any partner or any other person with authority to bind the partnership. See sec. 6229(b).[7]

---

[7] Petitioner may have in mind agreements to extend the sec. 6229(a) period of limitations entered into by partners of other partnerships sponsored by AMCOR. Throughout the course of petitioner's memoranda, petitioner fails clearly to relate his complaints to the partnership or distinguish between harms alleged to have been suffered by the partnership and harms suffered by AMCOR, its principals, or the remaining AMCOR sponsored partnerships. Respondent and the tax matters partners in certain related cases have stipulated that they will be bound in those cases by our order on the motion. During the course of the hearing, we cautioned petitioner that the hearing concerned only the motion, which pertained only to the partnership. Respondent opposed the motion, and participated in the hearing, on the basis that the motion concerned only the partnership. As we said supra sec. III., we shall examine how respondent conducted himself with respect to the partnership and not how he conducted himself with respect to any other person, except to the extent such person was acting for the partnership.

D.  Conclusion

Petitioner's complaint with respect to respondent's use of fraud, deceit, and trickery in order to procure evidence for a criminal investigation fails to establish any ground on which to base any sanction of respondent in this case.

VIII.  "Misuse of a civil tax examination as a guise to secure evidence for use in a criminal tax investigation."

A.  Introduction

In petitioner's memorandum, he states:

> Even if Respondent's misconduct is placed in its most favorable light, the conclusion must be reached that the civil examination was used as a guise to obtain evidence for the use in the ongoing criminal investigation.  The Respondent, however, may not develop a criminal investigation under the auspices of a civil audit.  United States v. Grunewald, 987 F.2d 531, 534 (8th Cir. 1992).  [Fn. ref. omitted.]

> Moreover, the policy is stated clearly in the Internal Revenue Manual ("IRM");

> > [T]he Service should not attempt to use a civil examination to develop a criminal tax investigation.  If a criminal investigation is being developed with regard to a taxpayer, the Service must respect the taxpayer's rights and follow Manual instructions pertaining thereto.  Therefore, under no circumstances will these procedures be used to develop a criminal tax case under the guise of a civil examination.

> IRM § 9311.83(1) (Apr. 8, 1985).

> As this Court observed in Jones:

> > Any attempt to conduct a criminal investigation under the guise of a civil examination would have a chilling effect upon

> the normal demeanor of the parties in civil examinations.

97 T.C. at 29 (emphasis added).

> Here, the evidence demonstrating the use of a civil tax examination as a means to gather information for criminal investigative purposes is abundant.

That complaint is distinguishable from the immediately preceding complaint in that petitioner is complaining of respondent's methods for gathering evidence for use in a criminal investigation rather than for use in a civil examination.

B. Background

What we said above, in the first paragraph of section VII.B., is equally applicable here. Also, 2 Audit, Internal Revenue Manual (CCH) section 4565.21, at 14,382, provides that, if an employee of respondent's conducting a civil examination of a taxpayer comes across a firm indication of fraud on the part of the taxpayer, she must suspend her examination so that an evaluation can be made as to whether the case is appropriate for criminal investigation.[8] Several courts have relied on the "firm indications of fraud" rule of 2, Audit, Internal Revenue Manual (CCH) sec. 4565.21(2) as an appropriate benchmark for determining

---

[8] The Court of Appeals for the Sixth Circuit has stated: "compliance with § 4565.21 is mandated by the Constitution." United States v. McKee, 192 F.3d 535, 542 (6th Cir. 1999); accord Grunewald v. Commissioner, 897 F.2d 531, 534 (8th Cir. 1993). But see Groder v. United States, 816 F.2d 139, 142 (8th Cir. 1987) (classifying Internal Revenue Manual sec. 4565.21 as essentially a procedural rule conferring "no substantive rights or privileges upon taxpayers").

whether respondent has attempted to conduct a criminal investigation under the guise of a civil examination. See United States v. Peters, 153 F.3d at 452 (and cases cited therein). A firm indication of fraud is different from an initial indication that fraud exists, and it is more than a mere suspicion of fraud. See, e.g., United States v. Peters, supra at 455-456. The determination of a firm indication of fraud is a factual determination that can only be determined on a case-by-case basis. See id. at 456. Moreover, only the victim of conduct improper under the Fourth Amendment has standing to challenge such conduct by seeking suppression of the evidence obtained under the exclusionary rule. See United States v. Payner, 447 U.S. 727, 731 (1980). Nor does a Federal court's inherent supervisory power authorize the court to suppress otherwise admissible evidence on the ground that it was seized unlawfully from a third party not before the court. Id. at 735.

C. Discussion

Petitioner has failed to prove the particulars of respondent's examination with respect to the 1986 partnership return. See supra sec. VII. During his investigation of Dodson and McCoy, Special Agent Goolkasian came to believe that there were one or more tax fraud conspiracies involving, variously, as conspirators, Dodson and McCoy, Mr. Frame, Mr. Jones, petitioner, Mr. Wright, Mr. Schreiber, and AMCOR. On October 26, 1988, the

fraud referral was made, referring AMCOR to respondent's CID for a criminal fraud investigation. In early 1989, Special Agent Watson accepted the fraud referral with respect to Mr. Schreiber, who became the target of a criminal investigation by Special Agent Watson. Subsequently, Special Agent Watson and personnel from the Laguna Niguel Examination Division commenced a joint investigation into AMCOR, its principals, and the AMCOR-sponsored partnerships' tax shelter activities. On August 29, 1989, petitioner and Mr. Wright became subjects of Special Agent Watson's investigation.

Petitioner has failed to prove that, in the course of respondent's examination of the 1986 partnership return, respondent intended to obtain or, indeed, obtained any information for the purposes of any criminal investigation. See supra sec. VII.C. (petitioner has failed to prove any details of the examination of the 1986 partnership return).

D. Conclusion

Petitioner's complaint with respect to respondent's alleged misuse of a civil tax examination as a guise to secure evidence for use in a criminal tax investigation fails to establish any ground on which to base any sanction of respondent in this case.

IX.   "<u>Deprivation of access to vital business books and records</u>
      <u>by their seizure and extended retention pursuant to a</u>
      <u>search warrant that was improperly sought and wrongfully</u>
      <u>issued on the basis of material misrepresentations of fact</u>
      <u>made under oath.</u>"

In the motion, petitioner avers:  "Special Agent Goolkasian committed perjury in his affidavit in support of the March 21, 1989, search warrant for the books and records of the AMCOR partnerships."  Petitioner claims that, in the application (for the warrant), Mr. Goolkasian misrepresented that books and records of AMCOR were concealed.  In petitioner's memorandum, he broadens his complaint:  "The seeking of a search warrant in this situation was not to fulfill any legitimate purpose but, rather, to serve Mr. Goolkasian's objective of conducting an improper general search and coercing the targets of the criminal investigation."  Petitioner particularizes the harm he claims to have suffered:  "By improperly seizing these business records, Respondent denied AMCOR and the TMP effective access, severely prejudicing the TMP in his ability to timely and fully prepare his cases."

Petitioner argues his standing to make a Fourth Amendment claim with respect to the execution and consequences of the warrant:  "The Respondent's blatant violations of the TMP's, AMCOR's and the AMCOR partnerships, including Crop Associates-86, Fourth Amendment rights, moreover, gives TMP standing on behalf of Crop Associates-86."  In support of that proposition,

petitioner cites Rakas v. Illinois, 439 U.S. at 142 (person need not have a recognized property interest in a premises in order to claim the protection of the Fourth Amendment with respect to use of the premises).

Petitioner does not have standing to raise Fourth Amendment claims for a third party. See United States v. Payner, supra at 731 ("a court may not exclude evidence under the Fourth Amendment unless it finds that an unlawful search or seizure violated the defendant's own constitutional rights." (Emphasis added.)); Rakas v. Illinois, supra at 133-134 ("Fourth Amendment rights are personal rights which * * * may not be vicariously asserted." (quoting Alderman v. United States, 394 U.S. 165, 174 (1969)). The legality of a search or seizure may be challenged only by one who has a legitimate expectation of privacy in the items seized or the area searched. See United States v. Padilla, 508 U.S. 77, 82 (1993) (per curiam); United States v. Sarkisian, 197 F.3d 966 (1986) (9th Cir. 1999). On brief, petitioner states: "[R]espondent's violations were committed against the targets in their capacities as representatives of Crop Associates - 1986 and are, therefore, claims of the petitioner/parties." Petitioner is making a claim on behalf of the partnership.[9] We assume that a partnership has standing to raise a Fourth Amendment claim with

_____

[9] We do not consider any Fourth Amendment claim that petitioner may have separate and apart from the partnership's claim.

regard to partnership property.  See, e.g., <u>In re Subpoena Duces Tecum</u>, 81 F. Supp. 418 (N.D. Cal. 1948) (partnership was able to claim Fourth Amendment rights); cf. <u>Fleming v. Montgomery Ward & Co.</u>, 114 F.2d 384, 387 (7th Cir. 1940) ("corporation is entitled * * * to the protection of the Fourth Amendment against unreasonable searches and seizures of its papers.").  The expectation of privacy in a commercial setting is less than in a residential setting.  See <u>Minnesota v. Carter</u>, 525 U.S. 83, 89 (1998); <u>New York v. Burger</u>, 482 U.S. 691, 700 (1987) (the "expectation of privacy in commercial premises * * * is different from, and indeed less than, a similar expectation in an individual's home.").  Petitioner has not established that the partnership had any expectation of privacy with respect to AMCOR's premises, let alone a legitimate expectation.  See <u>United States v. Padilla</u>, <u>supra</u>.  As a result, petitioner has not established that he, on behalf of the partnership, has Fourth Amendment standing to challenge the search of AMCOR's premises.

In any event, petitioner has failed to prove that any partnership books and records were seized pursuant to the warrant.  Rule 41 of the Federal Rules of Criminal Procedure addresses search and seizure.  Fed. R. Crim. P. 41(d) provides:

> (d) <u>Execution and Return With Inventory</u>.  The officer taking property under the warrant shall give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property taken or shall leave the copy and receipt at the place from which the property was taken.  The

> return shall be made promptly and shall be accompanied by a written inventory of any property taken. The inventory shall be made in the presence of the applicant for the warrant and the person from whose possession or premises the property was taken, if they are present, or in the presence of at least one credible person other than the applicant for the warrant or the person from whose possession or premises the property was taken, and shall be verified by the officer. The federal magistrate judge shall upon request deliver a copy of the inventory to the person from whom or from whose premises the property was taken and to the applicant for the warrant.

An employee of respondent's made a detailed inventory of the items seized pursuant to the warrant (the inventory). Fed. R. Crim. P. 41(d) requires that, upon request, the Federal magistrate shall deliver a copy of such inventory to the person from whom or from whose premises the property was taken. We assume that person to be AMCOR, with whom petitioner was closely related (petitioner describes himself as an "AMCOR principal"). On brief, petitioner states that the inventory was filed under seal. Even if that were so, petitioner has failed to show any effort to unseal the inventory and produce it in support of petitioner's claim that partnership books and records were seized pursuant to the warrant. Petitioner does not argue that the inventory would fail to show whether or not partnership books and records were seized pursuant to the warrant. Petitioner's failure to produce the inventory or any other evidence that partnership books and records were seized pursuant to the warrant leads to the inference that either such evidence does not exist

or would be negative to petitioner.  <u>Wichita Terminal Elevator Co. v. Commissioner</u>, 6 T.C. 1158, 1165 (1946)("the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable"), affd. 162 F.2d 513 (10th Cir. 1947).  We find that no partnership books and records were seized pursuant to the warrant.  Petitioner has failed to show how, on account of the execution of the warrant and the retention of any items seized pursuant to the warrant, he has been disadvantaged in prosecuting the petition in this case.

Petitioner's complaint with respect to respondent's alleged seizure and extended retention of vital business books and records pursuant to an illegal search warrant fails to establish any ground on which to base any sanction of respondent in this case.

X.  "<u>Misrepresentation of the status and duration of a related grand jury investigation in a manner that seriously impeded the civil tax litigation.</u>"

In June 1990, acting on a recommendation of respondent, the Department of Justice (the Department) commenced a grand jury investigation of petitioner, Messrs. Schreiber and Wright, and two others in connection with the operation of a fraudulent tax shelter (the grand jury investigation).  On March 1, 1993, the Department declined prosecution of the subjects of the grand jury investigation for the reasons set forth in our findings of fact.

In petitioner's memorandum, petitioner avers that, because of
inactivity, "for all intent and purpose", the grand jury
investigation terminated on September 1, 1991. Petitioner
complains:

> Thus, by withholding the fact of the termination of the
> grand jury's investigation, the government delayed the
> progress of these civil proceedings for over two years;
> AMCOR's seized documents remained under lock and key;
> and TMP was denied access to information possessed by
> AMCOR's principals who, unwittingly, believed they were
> still under criminal investigation and feared,
> appropriately, waiving their rights against self-
> incrimination.
>
>             *     *     *     *     *     *     *
>
>     Most importantly, but for the delay, two central
> witnesses for TMP who are now dead would have been
> available. George Schreiber, the general partners
> [sic] who had overall responsibility for the
> partnerships' farming operations, and who was a target
> of the grand jury investigation, died in August, 1991.
> * * * Carl Hansen, an employee of AMCOR who was
> directly and significantly involved in the farming
> operations, died in February, 1993. * * *

As a remedy, petitioner asks that the case be dismissed.

Petitioner bases his averment that the grand jury
investigation terminated on September 1, 1991, on two proposed
findings of fact:[10]

---

[10] Those are petitioner's proposed findings 85 and 86.
Petitioner refers to proposed findings 86 and 87; 87 is as
follows: "By June 1, 1991, Exam's administrative files were
transferred to the Office of District Counsel, Laguna Niguel, and
the AMCOR Civil Tax Force headed by Group Manager Silverman was
terminated." (Ref. to record omitted.) We assume that the
reference to proposed finding 87 was supposed to be to proposed
finding 85.

> September 1, 1991, was the last time evidence was presented to the grand jury investigating the principals of AMCOR. [Ref. to record omitted.]

> Between September, 1991, and March 1, 1993, there was no communication between the respondent and the Department of Justice on the issue of whether the criminal cases would be prosecuted; this was an abnormally long passage of time. [Ref. to record omitted.]

Petitioner offers the testimony of William Shipley, Regional Counsel, Western Region, in support of the two proposed findings. Mr. Shipley did not testify as to the date of the last meeting of the grand jury, and he simply said that he was unaware of any grand jury activity after September 1991. Petitioner has failed to show that Mr. Shipley would have been privy to the Department's progress with the grand jury. Further, petitioner's references in support of his second proposed finding do not support such a finding as to a lack of communication. Mr. Shipley did testify that more than 1 year passed from respondent's submission of material to the Department and the Department's response. He could not, however, explain the reasons for that delay. Petitioner has failed to prove that the grand jury investigation terminated on September 1, 1991. He has failed to prove that there was undue delay in terminating the grand jury. Moreover, petitioner has failed to prove that the grand jury investigation was unfounded. The testimony of respondent's agents, in particular, George Martin, and Steve Sterquell, leads us to believe that respondent's suspicions of

fraud and the Department's presentation to a grand jury were well founded, no matter what the outcome.

Moreover, we fail to see any prejudice in connection with Mr. Schreiber's death in August 1991, 1 month before petitioner claims the grand jury investigation ended.  Also, although petitioner proposes as a fact that Mr. Hansen is dead, he provided no reference to any evidence in support of that proposed finding, nor did he propose a finding that Mr. Hansen was even a subject of the grand jury investigation.  Finally, petitioner alleges that the grand jury investigation deprived petitioner of access to items seized pursuant to the warrant.  Petitioner has failed to prove that any of those items seized were the partnership's books and records.

Petitioner's complaint with respect to respondent's alleged misrepresentation of the status and duration of a related grand jury investigation fails to establish any ground on which to base any sanction of respondent in this case.

XI.   "Improper dissemination of grand jury materials."

In petitioner's memorandum, he states:  "Because of Respondent's attorney's laxity, grand jury documents were disseminated to unauthorized persons, including attorney-members of the AMCOR Litigation Team and Special Agent Goolkasian."
Petitioner proposes the following finding of fact:

> The documents which were improperly disclosed to the
> Respondent in violation of Rule 6(e) of the Federal

Rules of Criminal Procedure included, Department of Justice attorney's review notes and letters, agreements executed by the AMCOR partnerships, letters, promissory notes, leases, a two-page letter to William K. Shipley, Deputy Regional Counsel, Internal Revenue Service, from Stanley F. Krysa, Director of the Tax Division's Criminal Enforcement Section, dated March 1, 1993 (EX 17-P) and fourteen pages of an internal Department of Justice Tax Division Memorandum ("DOJ Memo") prepared by Ronald A. Cimino, Stanley F. Krysa and James A. Bruton. (EX 90-P)

Rule 6(e) of the Federal Rules of Criminal Procedure (Fed. R. Crim. P. 6(e)) sets forth the general requirement of secrecy for grand jury proceedings. Where respondent has obtained and used grand jury materials in violation of Fed. R. Crim. P. 6(e), the Court in one instance has sanctioned respondent. Cohen v. Commissioner, 42 T.C.M. (CCH) 312, 1981 T.C.M. (P-H) par. 81,901 (exclusion of certain evidence and shifting burden of going forward with evidence). We did so where such sanctions were appropriate as a deterrent to future unlawful conduct. Compare Cohen v. Commissioner, id., with Kluger v. Commissioner, 83 T.C. 309 (1984) (suppression of materials inappropriate when obtained in good faith regardless of whether Fed. R. Crim. P. 6(e) order was proper).

In our findings of fact, we have described the motion for sanctions, made by the petitioning partners on July 22, 1994. The petitioning partners moved for sanctions based, in part, on a claim of breaches of grand jury secrecy. We denied the motion for sanctions. In doing so, we stated that, except with respect

to the two items identified in petitioner's proposed finding of fact as Exhibit 17-P and the Department of Justice memorandum, we were not convinced that any violations of Fed. R. Crim. P. 6(e) had occurred and, even if they did, the petitioning partners had failed to link such violations to the matters placed in issue in these cases. We concluded: "On the facts before us, we do not think that exclusion of evidence or dismissal of the cases would serve the interests of justice." Exhibit 17-P and the Department of Justice memorandum (and certain other items) were the subject of Ballas v. United States (In re Grand Jury Proceedings), 62 F.3d 1175 (9th Cir. 1995), described supra note 2. In Ballas, the Court of Appeals for the Ninth Circuit did not disturb the holding of the District Court "that only isolated and technical instances of improper disclosure had occurred."

We are unsure whether petitioner is bringing to our attention any items that were not previously considered by us in addressing the motion for sanctions or by the Court of Appeals for the Ninth Circuit in Ballas. In any event, petitioner has failed to show any link between any Fed. R. Crim. P. 6(e) violations and the partnership items at issue in this case. In particular, he has failed to show that any grand jury materials were improperly relied on by respondent in preparation for the trial in this case.

Petitioner's complaint with respect to respondent's alleged improper dissemination of grand jury materials fails to establish any ground on which to base any sanction of respondent in this case.

XII. "Recalcitrance during discovery, resulting in abnormal prejudicial delay" and "Obstreperousness and stonewalling during the hearing of this matter, causing additional unwarranted delay, court time and costs."

In petitioner's memorandum, he states:

> Respondent's counsel throughout the discovery stage of these proceedings had repeatedly attempted to prevent the TMP from discovering the full extent of Respondent's misconduct.  Later, Respondent attempted to thwart the TMP, in presenting the misconduct to the Court.

> From June 1990, when the first Tax Court petitions were filed, to the middle of 1994, Respondent failed to comply with discovery requests for answers to interrogatories and requests for documents, eventually resulting in sanctions being imposed. (Finding 147.)

> Respondent's deliberate attempts to obstruct TMP from learning the truth of his agent's misconduct carried over to an attempt to hamper TMP's presentation of the misconduct in the hearing of this motion. Respondent refused to stipulate to facts presented to him, which were proven during the hearing, causing further needless trial time and further expense to the TMP.

> Then, in the hearing, Respondent allowed false and misleading testimony to be introduced and used as the court's basis for rulings.  (Finding 148.)

Petitioner's argument in support of his final two complaints contains a hodgepodge of claims, some of which we have previously disposed of and the remainder of which are meritless.

Petitioner first complains of respondent's attempts to prevent or thwart petitioner's discovery. Petitioner has failed to support that complaint with any proposed findings of fact. Petitioner next complains of respondent's failure to comply with requests for discovery from June 1990 through the middle of 1994. By the motion for sanctions, on July 22, 1994, the petitioning partners moved for sanctions on account of alleged discovery abuses and violations by respondent. We denied the motion for sanctions in its entirety. Petitioner's proposed finding of fact in support of this claim does not bring to our attention anything new. Petitioner's complaints that respondent hampered petitioner's presentation in the hearing and failed to stipulate facts in anticipation of the hearing are also unsupported by the record.

Petitioner's final claim, that, during the hearing, respondent introduced false and misleading testimony, is supported by the following proposed finding of fact: "Respondent allowed false and misleading testimony from Sterquell to be introduced." In support of that proposed finding of fact, petitioner's only reference to the record is a reference to petitioner's motion, made during the hearing, to strike testimony (of Mr. Sterquell) and reconsider ruling that privilege was waived (motion to strike). We denied the motion to strike.

We did so, in part, on the basis that, if Mr. Sterquell's testimony were false, then it was petitioner's task to impeach Mr. Sterquell. We found that petitioner had an adequate opportunity to impeach Mr. Sterquell, by cross-examination or otherwise. We concluded our order denying the motion to strike by rejecting petitioner's broad claim of misconduct by respondent. Petitioner has failed to show any misconduct by respondent in connection with the testimony of Mr. Sterquell.

Petitioner's complaints with respect to respondent's alleged discovery abuses or conduct during the hearing fail to establish any ground on which to base any sanction of respondent in this case. Indeed, it is appropriate to repeat here the remark we made in the course of the trial on the merits in this case, which followed the hearing. In our order dated January 7, 2000, we stated:

> Petitioners also make various claims concerning "stonewalling" by respondent. Petitioners have made similar claims throughout this litigation, since the appearance of petitioners' present counsel. In our order of December 9, 1999, we rejected petitioners' characterization of respondent's behavior in this case as "stonewalling". Indeed, we stated: "It is petitioners who have repeatedly asked, both formally and informally, for continuances." Again, we reject petitioners' characterization of respondent's behavior as stonewalling. Indeed, petitioners' claim of respondent's tardy response, discussed above, seems to us to have such little merit that we caution petitioners' counsel to be aware of section 6673(a)(2) ("Counsel's liability for excessive costs.").

XIII. Conclusion

We have rejected every ground set forth by petitioner in support of the motion. We do not find that respondent's actions during the course of his examination of the 1986 partnership return or during the course of this case prejudiced petitioner in presenting his case. With respect to respondent's examination of the 1986 partnership return, respondent issued the FPAA within the statutory period. We have set forth in detail the major procedural steps of this case from the petition to the motion. The initial delay was on respondent's motion, but the petitioning partners were also the authors of motions to continue or motions that otherwise delayed the proceedings. There have been numerous participating partners during the intervening 10 years, and petitioner waited until May 1999 to ask for leave to intervene.[11] Blame (if any) for the time it took to proceed to the present posture cannot be laid only at the feet of respondent.

Petitioner also claims that the delay will cost him additional interest, which we should abate. In Dixon v. Commissioner, T.C. Memo. 1999-101, the Court denied time-sensitive additions to tax for negligence under sections 6653(a)(2) and 6653(a)(1)(B) and increased interest under section

---

[11] Petitioner says that he could not participate in this proceeding during the time he was under criminal investigation. The grand jury investigating petitioner concluded by Mar. 1, 1993. In his motion to intervene, petitioner claims that, thereafter, he believed that the interests of the partners was being adequately represented by counsel for the petitioning and participating partners.

6621(c) as a sanction against the IRS for its district counsel's misconduct in the trial of the test cases. The Court's sanction was based on its finding that the IRS' misconduct in the trial of the test cases had caused a substantial delay in resolution of the cases. Id. In the current case, there are no time-sensitive additions to tax or increased interest at issue. A change in the tax liability of a partner to reflect properly the treatment of a partnership item under subchapter C is made through a computational adjustment. See sec. 6231(a)(6). A computational adjustment includes any interest due with respect to any underpayment attributable to adjustments to reflect properly the treatment of partnership items. See sec. 301.6231(a)(6)-1T(b), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 6790, 6791 (March 5, 1987). Such interest, however, is not a partnership item. See sec. 301.6231(a)(3)-1, Proced. & Admin. Regs. We have no jurisdiction in a partnership proceeding to abate interest. See sec. 6226(f). In certain cases, Congress has provided for the abatement of interest. See sec. 6404(i) (establishing jurisdiction in Tax Court to review denials of requests to abate interest in certain cases). The prerequisites of section 6404(i) have not here been met.

Therefore, we shall deny the motion in its entirety.

<u>An appropriate order</u>

<u>will be issued</u>.